**Stokely CARMICHAEL et al.,
Plaintiffs,**

v.

**Ivan ALLEN, Jr., Mayor of City of
Atlanta, Georgia et al., Defendants.**

**Civ. A. No. 10421.**

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 13, 1966.

Judgment Jan. 16, 1967.

Supplemental Order March 7, 1967.

Howard Moore, Jr., Atlanta, Ga., William M. Kunstler, Arthur Kinoy, New York City, Len W. Holt, Washington, D. C., Morton Stavis, Dennis J. Roberts, Newark, N. J., Michael Standard, New York City, for plaintiffs.

J. Walter LeCraw, Atlanta, Ga., for Slaton and Grimes.

Arthur K. Bolton, Atty. Gen., G. Ernest Tidwell, Exec. Asst. Atty. Gen., Mathew Robins, Atlanta, Ga., for State of Georgia.

Henry L. Bowden, Ferrin Y. Mathews and Martin McFarland, Atlanta, Ga., for Allen, Jenkins & Redding.

Before TUTTLE, Circuit Judge, and HOOPER and SMITH, District Judges.

PER CURIAM:

This is a suit by the plaintiffs seeking a judgment declaring unconstitutional certain Georgia criminal statutes, and an Atlanta City Ordinance. The plaintiffs are Stokely Carmichael, an individual, and as Chairman of the Students Nonviolent Coordinating Committee, suing "on behalf of himself and all members of the staff of SNCC as well as all Negro residents of the City of Atlanta and County of Fulton, Georgia, similarly situated, which class is too numerous to bring before the Court," and Student Nonviolent Coordinating Committee, an unincorporated association, in its own behalf.

The defendants are Ivan Allen, Jr., Mayor of the City of Atlanta, Herbert T. Jenkins, Chief of Police of the City of Atlanta, T. Ralph Grimes, Sheriff of Fulton County, Georgia, Lewis Slaton, Solicitor General (the principal prosecuting officer) of the Atlanta Judicial Circuit, State of Georgia, and Morris L. Redding, a police officer of the City of Atlanta.

In the complaint it is alleged that the Student Nonviolent Coordinating Committee (hereafter "SNCC") is:

"An unincorporated association maintaining an office for business purposes in the City of Atlanta, Georgia, whose purpose is to help to secure to all Negro citizens the rights guaranteed to them under the Constitution of the United States, and to end all forms of racial segregation and discrimination in the interest of Negro and white citizens throughout the United States. In support of these purposes SNCC, its

staff and supporters engage in all forms of legitimate protest activities, including, but not limited to picketing, demonstrations, rallies, mass meetings, voter registration drives, community organization, and publication. SNCC seeks to obtain its objectives through the utilization of the fundamental rights of free speech, press and assembly, and the right to petition the government for the redress of grievances."

It is asserted that the jurisdiction of the court over the complaint arises under Title 28 U.S.Code, Sections 1331, 1332, 1343(3), (4), 2201, 2202, 2281 and 2284; Title 42 U.S.Code, Section 1971, and 1981, 1983 and 1985; "The Civil Rights Act of 1964"; the "Voting Rights Act of 1965," and the Constitution of the United States and more particularly, the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Thirteenth, Fourteenth, and Fifteenth Amendments thereto.

The basis of the plaintiffs' suit, as alleged by them, is that the defendants have purposefully entered into a plan or scheme of concerted and joint action with other persons unknown to the plaintiffs to subject or cause to be subjected the plaintiffs to a deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States. The plan or scheme alleged in the complaint is that the defendants have attempted to, and have threatened to continue to, attempt to prosecute the plaintiffs and the class which they represent or those working in cooperation with SNCC under the color and authority of certain state statutes and city ordinances, which will be hereafter outlined; that the said prosecutions and threatened prosecutions under the named statutes were not in a good faith attempt to vindicate the criminal statutes of the state of Georgia, but were for "the sole purpose of subjecting and causing to be subjected the plaintiffs and members, friends and supporters of SNCC to the deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States."

The stated objectives, which plaintiffs say are interfered with by prosecution based on such laws, are the attempts "through peaceful and nonviolent means to achieve the elimination of all forms of racial segregation in the United States and the state of Georgia, and to assist and encourage Negro citizens to exercise their rights to register and vote in federal and state elections." It is asserted that these objectives are specifically protected and guaranteed by the Constitution of the United States; that "in their constant efforts to achieve these constitutionally protected efforts, [sic] the plaintiffs and members, friends and supporters of SNCC have been attempting to exercise rights guaranteed them under the First and Fourteenth Amendments of the Constitution aforesaid to freedom of speech, press, assembly, association, and the right to assemble, associate and petition for a redress of grievances."

The gravamen of this charge is that it was a bad faith effort to interfere with admitted rights by misuse of the state's criminal procedures.

A second basis of the suit is the contention that the statutes are unconstitutional on their face, as being vague and overbroad; that the overbreadth is of a nature that would permit constructions which would violate plaintiffs' First Amendment and other constitutional rights; that, therefore, threatened prosecutions under them have a "chilling" effect on the free exercise by plaintiffs and their class of the right of free speech, freedom of assembly and the right to protest.

The facts leading up to this litigation may be briefly stated. They will be stated as Findings of Facts, as required under the Federal Rules of Civil Procedure, Rule 52(a). The following numbered findings are based on undisputed testimony produced on the trial of this case.

(1) Shortly after 1:00 P.M., on September 6, 1966, in the Summerhill area of Atlanta, near the intersection of Capitol Avenue and Ormond Street, Officers Harris and Kerr, of the Atlanta Police

Department, saw a Negro man, Harold Prather, for whom they had a warrant of arrest. They ordered him to stop, but he ran and Harris gave chase. Harris fired three shots at Prather, and two of them struck him. The latter continued to run and fell on the steps of the porch of his mother's house at 39 Ormond Street.

(2) Numbers of Negro citizens of the community either witnessed the shooting or soon learned of it, and a number of them gathered at the Prather house, where the latter's mother was critical of the conduct of the police. Rumors quickly spread in the community and the mood of the crowd was of anger, and the cry of police brutality was taken up throughout the community.

(3) The Summerhill area, in which the shooting occurred, is a rundown, substandard residential community occupied by low income Negro citizens. It is a community out of which prior complaints criticizing the inadequacy of recreation and school facilities had been voiced by its residents.

(4) At about 2:30 P.M. the plaintiff Carmichael first heard about the shooting from a news reporter for radio station WAOK. The news reporter persuaded Carmichael to go to the intersection of Capitol and Ormond Streets, where he then found a crowd of some 50 people near the intersection. Some of these people, who were residents of the community, displayed crudely made signs criticizing the police and protesting the shooting. Some of those present asked Carmichael, as Chairman of SNCC, to assist them in their protest and criticism of the Prather shooting and other acts. Carmichael agreed to do this and promised to return at 4:00 o'clock and assist or participate in a protest demonstration. Before leaving the area he went with the reporter into a telephone booth where he dictated a statement to be broadcast over station WAOK. In this statement, ac-

cording to his testimony in this court, he said "that we were tired of these shootings, these incidents that occurred, and that we would mount a protest and tear up and turn inside out the city until these incidents have stopped." [1]

(5) Carmichael then returned to the SNCC office at 360 Nelson Street, where a regular monthly meeting of the Central Committee was in progress. From there he called William Ware, a member of SNCC, and director of an Atlanta project for SNCC located in another low income Negro area of Atlanta known as Vine City. At Carmichael's request, Ware went to the vicinity of Capitol and Ormond Streets, where he obtained a sound truck owned by SNCC, and parked it on the street near the corner. There, over the loudspeaking system of the sound truck, he called for people to come and state what they had seen or what they knew about the shooting of Prather. One or two persons came and spoke over the loudspeaker, telling of their impressions of the occurrence. Their statements were inflammatory. Thereupon, Sergeant Perry, of the Atlanta Police Force, directed Ware to remove the truck from the street, and upon his failure to do so he placed Ware under arrest, charging him with unauthorized use of sound equipment on a public street. Ware was taken to the patrol wagon without resistance, but another member of SNCC, Bobby Walton, took the microphone in an effort to continue the program, but he, too, was arrested and placed in the patrol wagon with Ware.

(6) The arrest of these two men stirred up additional excitement and resentment, resulting in the first physical interference with the work of the police. The crowd, increasing momentarily, loudly and boisterously, surged forward and shook the patrol wagon from side to side. However, the police were able to move the wagon away, after some difficulty. In

1. For whatever value it may have, he then stated, in response to the question as to what he meant by that remark: "Well, I think the black people of this country are afraid to protest, and legitimately so, that's my own feeling. And that they must be urged and coerced to come out of that fear, to wake up, to tear up that fear."

doing so, the patrol wagon, which was driven by a white police officer, struck a pregnant Negro woman. Thereupon, the crowd became further incensed and boisterous and numbers of them began to throw rocks and bottles at the police and the patrol wagon.

(7) This turmoil continued until, at about 4:00 o'clock, someone called Carmichael at the SNCC office and reported that Ware and Walton had been arrested and that things were getting "pretty rough." After some discussion by the staff at SNCC headquarters, Carmichael decided to return to the scene, and went there in a car driven by Isaac Simpson, of SNCC. Several other SNCC members rode with him. By this time, the air was full of missiles and windows were being knocked out of the police cars, and at this time, or shortly thereafter, police cordoned off the area to prevent others from coming into the intersection, after one or two other vehicles driven by white persons had been damaged and the occupants threatened by members of the crowd.

(8) From time to time, the police arrested persons they saw actually throwing missiles and attempted to have them removed in the police patrol wagon. This occasioned other fights and resistance against the arrests.

(9) Carmichael remained at the intersection of Capitol and Ormond at least ten minutes. His presence thereafter is subject to dispute. This will be discussed later. He thereafter returned to the SNCC office, where he remained the rest of the evening.

(10) Shortly after 5:00 P.M., the Mayor arrived at the scene and stood atop a police car to address the crowd. His reception was generally very unfriendly, although some urged the crowd to be quiet to listen to the Mayor speak. Many in the crowd hurled epithets at the May-or, calling him a "white racist" or worse, and others vented their anger by rocking the car on which the Mayor was standing. He was dislodged and fell to the ground, but quickly regained the top of the automobile. Thereafter the police began firing into the air and discharging tear gas canisters in the community.

(11) During the afternoon's melee, several officers were struck by rocks, others were knocked down, and, following the discharge of the gas canisters, some thirty to forty members of the Negro community were injured or sickened and required emergency hospital treatment.

(12) The acts of violence that occurred during the afternoon and early evening were almost entirely directed towards the white police, although several white motorists who drove into the intersection of Capitol and Ormond Streets were stoned and their cars were rocked by the Negro members of the community.

(13) By now the police completely occupied the area, and by dark calm had been restored.

(14) During the next few days warrants for the arrest of fourteen persons, including the named plaintiff, and including 4 or 5 members of SNCC, and including others who were not members, were issued. Those named were arrested and, after commitment hearings were had at the Atlanta Police Court, these fourteen were bound over to the Fulton County Grand Jury under a charge of "Riot." [2]

(15) Prior to the arrest of Carmichael, he had made a public statement denying the charge that had been made by many persons following the September 6th violence that SNCC was responsible for "the revolt of the black community." This statement was mimeographed and handed out in the Summerhill community. [3]

---

2. Section 26–5302, Code of Georgia Annotated:
"Riot.—Any two or more persons who shall do an unlawful act of violence or any other act in a violent and tumultous manner, shall be guilty of a riot and punished as for a misdemeanor."

3. "This is a message that my Black brothers and sisters will understand better than anyone else and that is as it should be.
"Racist Mayor Ivan Allen of Atlanta is framing the Black people of this city and the Student Nonviolent Coordinating Com-

(16) On the day of the issuance by Stokely Carmichael of this statement, he visited in the Negro homes of the area and posted some signs, with permission of the residents, on some of the homes, bearing the slogan "Black Power." He was followed during the visits made by him by police officers and police photographers.

(17) The warrant charging Stokely Carmichael with his part in the "riots" was issued following this conduct of his observed on September 8th.

(18) Earlier in the day the defendant Slaton, Solicitor General of the Atlanta Judicial Circuit, stated to reporters that he did not then have sufficient evidence to warrant presenting the case of Carmichael to a Grand Jury under the insurrection statute. At the hearing in this court, Mr. Slaton also testified that at that time he did not have sufficient evidence to present to the Grand Jury as to Carmichael's violation of any statute, and he explained that he did not even know of his having been arrested until later, and thus did not have available to him the basis for the arrest.

(19) On September 9th, the plaintiffs filed this law suit. At that time Carmi-

chael was in the Atlanta City Jail, held under bonds totalling $10,000, $9,000 on the charge of "Riot," and $1,000 on a charge of disorderly conduct, in violation of a City Ordinance.

(20) On September 13, 1966, defendant Slaton presented to the Fulton County Grand Jury, and the said Grand Jury returned a true bill charging Carmichael and fourteen others with violation of the "Riot" statute, whereupon they were released on bond.

(21) Of the fifteen persons named in the "Riot" indictment, five were members of SNCC, the other ten being Negroes who lived in the local community in the vicinity of the September 6th violence.

(22) On September 14, 1966, Mary Lane, Michael Wright and Cleveland Rickerson, all members of SNCC, were arrested by a City of Atlanta police officer, and charged with inciting to riot. They were subsequently bound over to the Superior Court of Fulton County on bonds in the amount of $1,000, after the charges were changed to "circulating insurrectionary literature." [4]

---

mittee, SNICK. Allen is saying that we're responsible for the revolt of the black community.

"The revolt was—and is—against the beastality of a racist mayor and his corrupt police department. The cop who shat Harold Prather in the back has neither been fired nor placed on trial. Mayor Allen has refused to deal with the rats, roaches and unemployment in the black community. Racist Allen has said that SNCC has run out of the black community.

"We are here. Here, Baby! We will stay * * * and shall keep on fighting racism, including the racism of Mayor Allen and his lies. Ivan Allen is not a white king,—and we are not his black subjects.

"WE SHALL HELP THE PEOPLE ARRESTED. PLEASE CALL OUR OFFICE AND GIVE THE NAMES OF THOSE ARRESTED OR INJURED. WE HAVE ESTABLISHED A DEFENSE COMMITTEE TO AID OUR BLACK BROTHERS AND SISTERS NOW IN JAIL.

"Ivan 'Racist' Mayor Allen has gotten his white power structure to start a fight and is fighting. Black people serve notice that he who fights us * * * shall be fought."

4. The statute dealing with "circulating insurrectionary papers," is Section 26–904, of the Georgia Code. As will be seen it refers to "Inciitng Insurrection," which is described in Section 26–902. For convenience, therefore, we quote the sections dealing with insurrection:

"Section 26–901.—Definition.—Insurrection shall consist in any combined resistance to the lawful authority of the State, with intent to the denial thereof, when the same is manifested or intended to be manifested or by acts of violence.

"Section 26–902.—Attempt to incite insurrection—Any attempt by persuasion or otherwise, to induce others to join in any combined resistance to the lawful authority of the State shall constitute an attempt to incite insurrection.

"Section 26–903.—Punishment.—Any person convicted of the offense of insurrec-

(23) In his answer filed in this court, defendant Slaton disavows any intention to present to the Grand Jury any charge of insurrection or attempting to incite insurrection (Section 26–901, 902 and 903 of the Code of Georgia) against any of the persons indicted under the riot indictment heretofore mentioned, or against any of the fourteen defendants named in a subsequent riot indictment resulting from another evening of violence in a different part of the city of Atlanta, to the extent that any such charge would be based "upon the said occasions or acts which are the bases of said two indictments, or against any other person accused of complicity in said riotous events." He does not disavow an intention to present to the Grand Jury any charges of insurrection or attempting to incite insurrection as to the future, nor does he disavow any intention to continue to prosecute a charge presently pending against Mary Lane, Michael Wright, Cleveland Rickerson, charged with circulating insurrectionary papers under Section 26–904.

(24) The Student Nonviolent Coordinating Committee is an unincorporated association whose headquarters are in Atlanta, Georgia. It currently has approximately 135 staff members who reside or have offices in different parts of the United States. It has no membership lists, as such, although it has lists of staff members who subscribe to the policies of the organization and undertake to obtain adherence by other interested persons in supporting special projects as they may be determined upon from time to time. These policies and programs are formulated and announced by a central committee of ten which meets once a month in Atlanta. The daily manage-ment and administration is the responsibility of the chairman, the executive secretary and the program secretary, who are elected annually by the SNCC staff. The organization also employs field secretaries who are stationed at several points throughout the country for the purpose of directing special projects. Small salaries, in the nature of subsistence, are paid full time employees when funds are available. The organization depends, for its financial support, upon voluntary contributions of friends and supporters.

■ (25) The named plaintiffs properly represent a class consisting of the members of the unincorporated association and their adherents for whom they sue.

■ (26) The state of Georgia, by its voluntary action, has intervened in the litigation; it is, therefore, bound by the findings of fact and the conclusions of law, as are the other parties to the suit.

In addition to the foregoing findings of fact, which are based upon undisputed testimony in the record, both plaintiffs and defendants introduced evidence as to which there is some degree of conflict. The most significant evidence as to which such a conflict arises is the testimony of Police Officer Claude Dixon, who testified that at approximately 4:30 on the afternoon of September 6th, he saw Stokely Carmichael fleetingly, "not more than a second, not more than a minute," at the Standard Oil Filling Station at Ormond and Capitol Avenue; that for five or ten minutes he assisted in moving police cars out of the area while they were under attack by the crowd, and between 4:30 and 5:00 o'clock he then went down to the in-

tion, or an attempt to incite insurrection, shall be punished with death; or, if the jury recommend to mercy, confinement in the penitentiary for not less than five or more than 20 years.
"Section 26–904.—Circulating insurrectionary papers.—If any person shall bring, introduce, print, or circulate or cause to be introduced, circulated, or printed, or aid or assist, or be in any manner instrumental in bringing, intro-ducing, circulating, or printing within this State any paper, pamphlet, circular, or any writing, for the purpose of inciting insurrection, riot, conspiracy, or resistance against the lawful authority of the State, or against the lives of the inhabitants thereof, or any part of them, he shall be punished by confinement in the penitentiary for not less than five nor longer than 20 years."

tersection of Atlanta Avenue and Capitol, approximately two blocks away, to set up a road block, and while at that point he said he saw a sound truck at Ormond and Capitol and heard a voice that he recognized as that of Carmichael saying, "They think we are going to leave the streets, but we ain't going to leave. Baby burn."

In Carmichael's testimony he denied making this statement, and testified that he had returned to SNCC headquarters at this time. No other of the officers present at Ormond and Capitol Avenue at this time testified to having heard or seen Carmichael in or about the sound truck at the time testified to by Officer Dixon.

Other conflicting testimony was given by several city policemen who testified to having seen certain of the persons among the fifteen indicted on the same true bill with Carmichael actually engage in violence, either by fighting the police or throwing rocks or smashing police car windows on the afternoon of the 6th. None of these was shown to be a member of SNCC. Some of these persons testified and denied committing any acts of violence.

Plaintiffs tendered in evidence a sheaf of newspaper clippings from Atlanta newspapers, and tendered evidence to the effect that immediate reaction from the press and other members of the community, both white and Negro in the city of Atlanta, publicly identified the acts of violence with SNCC. This evidence was not tendered, nor admitted, for the purpose of showing the truth of the statements, but to show, as the plaintiffs contended, that extreme pressure was placed upon the city officials to move against SNCC regardless of the availability of ample evidence for connecting its members with the violence.

In addition to the indictments resulting from the September 6th incident and the insurrectionary literature occurrence, some 70 to 90 Negro residents of the Summerhill community, and the community in the vicinity of the violence occurring on September 10th, have been arrested for breach of the peace.[5] They have been tried and convicted and have either paid fines or served short jail terms.

## CONCLUSIONS AND OPINION

Before discussing the issues presented in this case, we think it important to state what is not involved. The case does *not* involve, or in any way question, the fundamental right of the state of Georgia or the city of Atlanta to prosecute, within their respective spheres, any unlawful act of violence committed either individually or as a member of a mob against a police officer, a city official, or any private citizen. It does not seek to have this court determine whether the plaintiffs or any of the other indicted persons committed any of the acts which have been made the basis of indictments now pending against them.

What *is* before the court is a double-pronged attack upon the right of the state to prosecute, or otherwise seek to enforce against, the plaintiff or any of the members of the Student Nonviolent Coordinating Committee as a class, *five certain Georgia statutes* and *one city of Atlanta ordinance.* The two prongs to the attack are, stated in reverse order from that outlined above: (1) that section 5302, 26 Ga.Code Ann., (the Riot Statute) and Sections 901, 902, 903 and 904, 26 Ga.Code Ann., (having to do with insurrection), and Section 20–7 of "The Charter, Related Laws, Code and Ordinances of the City of Atlanta, "Volume II, Page 1022; (the Disorder-

---

5. "The Charter, Related Laws, and Code and Ordinances, Volume II, Code of Ordinances, City of Atlanta, Volume II, page 1022 (Prepared by the Municipal Corporation).
"Conduct. Section 20.7—It shall be unlawful for any person to act in a violent, turbulent, quarrelsome, boisterous, indecent or disorderly manner, or to use profane, vulgar or obscene language, or to do anything tending to disturb the good order, morals, peace or dignity of the city."

ly Conduct Ordinance of the City) are all void and unconstitutional on their face for the reason that they are so vaguely and broadly written that they purport to or may be construed to, prohibit conduct, and punish offenders for conduct, which is protected by the First Amendment Rights of the United States Constitution; and (2) that the defendants are utilizing these challenged statutory enactments, either with full knowledge of their invalidity or without concern as to their validity, not for the true purpose of vindicating the criminal powers of the state and city to punish for illegal acts, but with the ulterior purpose of interfering with protected rights of the plaintiffs and their class to exercise freedom of speech, freedom of press, freedom of assembly, and the right peaceably to protest.

The most recent, and the controlling, decision of the United States Supreme Court, which stands as authority for the making of such an attack upon the enforcement of a statute "regulating expression" on the one hand, and which, on the other hand, marks the limitations upon a person's right to federal court injunctive interference with threatened state prosecution is Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. In the *Dombrowski* case, the Supreme Court reversed an order of a three-judge district court in the Eastern District of Louisiana which (with one judge dissenting) dismissed a suit for injunction against enforcement of the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law,[6] "for failure to state a claim upon which relief can be granted." Although recognizing that the allegations of the complaint before the court raised serious constitu-

tional issues, the majority in the district court determined that the court should abstain from enjoining enforcement of the statute since a possible narrowing construction by the state courts would avoid an unnecessary decision on the constitutional questions.

In the *Dombrowski* case, as in the one before us, the state contended that it would be inappropriate for the federal district court to interfere with the orderly processing of state criminal prosecutions, since, it was alleged, the want of constitutionality of the Louisiana statute could be raised as a defense to any criminal prosecution. To that contention the Supreme Court answered:

"But the allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury." 380 U.S. 479, 485, 85 S.Ct. 1116, 1120.

The Court further stated:

"We hold the abstention doctrine is inappropriate for cases such as the present one where, unlike Douglas v. City of Jeannette [319 U.S. 157], statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities." 380 U.S. 479, 489, 85 S.Ct. 1116, 1122.

The state of Georgia [7] has, on several occasions within the last few years, undertaken to prosecute persons under the so-called Insurrection Statutes of the

---

**6.** The Subversive Activities and Communist Control Law, La.Rev.Stat., Sections 14:358 through 14:374, the Communist Propaganda Control Law, La.Rev.Stat., Sections 14.390 through 14:390.8.

**7.** The Solicitors General of the Several judicial circuits in the state of Georgia

are duly elected officials of the state. While they are in no way supervised by the Attorney General so far as relates to the filing of charges or the presenting of prospective prosecutions to grand juries for consideration, all of their acts as prosecutors are acts of the state of Georgia.

**994**

state of Georgia.[8] These prosecutions have been pursued notwithstanding the fact that the United States Supreme Court held, as long ago as 1937, that Section 902 (then Section 56 of the Penal Code) was unconstitutional and void. Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066.

The opinion of the Court in the *Herndon* case, invalidating Section 902 because it "does not furnish a sufficiently ascertainable standard of guilt," seems equally to condemn Section 901. The Supreme Court of Georgia, Herndon v. State, 179 Ga. 597, 600, 176 S.E. 620, 622, in construing Section 902, had equated it to Section 901 in that it was found that to be valid the incitement to insurrection, forbidden by Section 902, must involve force or the anticipated use of force, which is included in the definition of insurrection in Section 901. The Supreme Court said:

> "The act does not prohibit incitement to violent interference with any given activity or operation of the state. By force of it, as construed, the judge and jury trying an alleged offender cannot appraise the circumstances and character of the defendant's utterances *or activities* as begetting a clear and present danger of forcible obstruction of a particular state function. Nor is any specified *conduct* or utterance of the accused made an offense." (Emphasis supplied). 301 U.S. 242, 261, 57 S.Ct. 732, 741.

The Court then said:

> "The statute, as construed and applied, amounts merely to a dragnet which may enmesh any one who agitates for a change of government if a jury can be persuaded that he ought to have foreseen his words would have some effect in the future conduct of others. No reasonably ascertainable standard of guilt is prescribed. So vague and indeterminate are the boundaries thus set to the freedom of speech and assembly that the

law necessarily violates the guarantees of liberty embodied in the Fourteenth Amendment." 301 U.S. 242, 263, 57 S.Ct. 732, 742.

More lately, a three-judge district court in the Middle District of Georgia held these statutes to be "unconstitutional and void." See Aelony v. Pace, 8 Race Relations Law Reporter 1355, 32 U.S. Law Week. 2215 (not otherwise reported).

■ Although the Solicitor General, defendant in this case, disavows any intention of presenting a proposed bill of indictment against any of these plaintiffs or any others for acts arising out of the events of September 6th or September 10th, or otherwise to seek prosecution *for such acts* under these insurrection statutes, neither Mr. Slaton nor any other representative of the state of Georgia has disavowed, any further intention to use these statutes in the future. It is hardly necessary to point out the "chilling" effect upon the exercise of the freedom of speech and assembly of a statute prescribing punishment by electrocution if a person, conscientiously seeking to exercise these rights, must pattern his speech with the ever present threat of such a sanction. The court will grant an injunction prohibiting future prosecutions under Sections 901, 902 and 903, of Title 26, of the Georgia Code.

■ There is actually pending at the present time a prosecution against three persons, all members of SNCC, who were arrested for distributing literature under Section 904, the section dealing with "Circulating Insurrectionary Papers." [9] Worded in terms of a prohibition against absolute freedom of expression, and keyed, as it is, to the section of the Code defining "Inciting Insurrection," as well as riot, conspiracy or resistance against the lawful authority of the state, it is clear that this section is too broad, vague and uncertain in that it obviously forbids, under penalty of twenty years in in the penitentiary, the bringing or in-

---

**8.** See footnote 4, supra.

**9.** See footnote 4, supra.

troducing, printing or circulating of a paper or other writing for the purpose of inciting an insurrection, which, by virtue of the Supreme Court's decision in Herndon v. Lowry, supra, is no longer a valid restriction on the freedom of the press. Cf. Shuttlesworth v. City of Birmingham, 373 U.S. 262, 83 S.Ct. 130, 10 L.Ed.2d 335 (1963).[10] This section is likewise unconstitutional and void as placing severe criminal sanctions upon a range of activities, some of which are protected by the First Amendment to the United States Constitution. See Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469, where the Supreme Court said:

"Here as in the cases discussed above, we deal with First Amendment rights. Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that if reachable by the police power, freedom of speech or of the press suffer. We said in Cantwell v. Connecticut, supra, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, that such a law must be 'narrowly drawn to prevent the supposed evil,' 310 U.S., at 307, 60 S.Ct., at 905, and that a conviction for an utterance 'based on a common law concept of the most general and undefined nature,' id., at 308, 60 S.Ct., at 905, could not stand."

■ The plaintiffs are, therefore, entitled to an injunction against any prosecutions or other enforcement by the State of section 904 of the Code.

We come next to the claim by the plaintiffs that they are entitled to have the defendants enjoined from enforcing against them the provisions of the Georgia Riot Statute. Section 26–5302, of the Georgia Code, provides as follows:

"Riot.—Any two or more persons who shall do an unlawful act of violence, or any other act in a violent and tumultuous manner, shall be guilty of a riot and punished as for a misdemeanor."

Plaintiffs contend that this statute is void on its face and thus deprives them of liberty without due process of law if sought to be enforced in a criminal case, because it is too vague and uncertain to state any ascertainable standard of guilt. The argument is that even if the legislature could properly define the crime of riot so as to reach "any two or more persons who shall do an unlawful act of violence," the legislature could not make guilty of the crime of riot those who might fall within the remaining language of the section "or any other [presumably legal] act in a violent and tumultuous manner." They say that the legislature simply has not the power to punish a *lawful* act done in a violent and tumultuous manner. It is not difficult to imagine a number of lawful acts done in a "violent and tumultuous manner" that would obviously be beyond the proper reach of such a statute.

■ However, reference to the *Dombrowski* case makes it clear that a plaintiff seeking to prevent the application to him and others similarly situated of criminal sanctions before indictment and

10. In *Shuttlesworth*, the petitioners were convicted of inciting, aiding, and abetting others to violate Birmingham's criminal trespass ordinance, in connection with a sit-down demonstration. The Supreme Court voided the trespass convictions in Gober v. City of Birmingham, 373 U.S. 374, 83 S.Ct. 1311, 10 L.Ed.2d 419 (1963), and held in *Shuttlesworth* that there could be no valid criminal conviction for inciting, aiding, or abetting another person to do an act which was not a crime. In this case, we are faced with a statute (§ 26–904) which purports to make criminal the circulation of literature "for the purpose of inciting insurrection," etc. But, as we have already noted, the Supreme Court held in Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066 (1937), that the Georgia statute (§ 26–902) which attempts to make "inciting insurrection" a crime furnishes no sufficiently ascertainable standard of guilt. Thus there is no valid Georgia law which makes "inciting insurrection" a crime, and the reasoning employed in the *Shuttlesworth* case would seem to apply here.

trial in the criminal courts of a State does not have the right to interfere with every state prosecution, even though he may ultimately establish the fact that the statute under which the State is prosecuting him is void for vagueness on general constitutional grounds. It is only in such situations where the over-breadth of the statute interferes with a First Amendment right, such as the freedom of expression, or where the normal state trial does not assure adequate vindication of constitutional rights, that an equity court can properly be called upon to enjoin prosecutions on the ground of vagueness of a statute. For instance, the court said:

"On this view of the 'vagueness' doctrine it is readily apparent that abstention serves no legitimate purpose where a statute *regulating speech* is properly attacked on its face, and where, as here, the *conduct charged in the indictments* is not within the reach of an acceptable limiting construction readily to be anticipated as the result of a single criminal prosecution and is not *the sort of 'hard core' conduct* that would obviously be prohibited under any construction." 380 U.S. 479, 491, 85 S.Ct. 1116. (Emphasis added).

■ In view of this limitation on the application of the doctrine, it seems clear that we need not construe the Georgia Riot Statute in order to ascertain whether it may ultimately be held unconstitutional for vagueness. This follows because this statute speaks only in terms of *violent and tumultuous conduct.*[10a] It does not speak in terms of expression, nor in terms of *"peaceable* assembly," (the language of the First Amendment itself). It also follows from the fact that the acts *charged in the indictments* before the court, regardless of whether these indictments ultimately result in conviction or acquittal, describe "hard core" conduct that would obviously be

prohibited under a limiting construction of the riot statute, should one hereafter be made by the Georgia courts. Here, although we explicitly refrain from appraising the substantiality of the evidence for a conviction of any person charged, it is apparent that the actual *indictments* against the named plaintiffs and the others said to arise out of the occurrences on September 6th and 10th, come within the first part of the Riot Statute: "any two or more persons who shall do an unlawful act of violence." There is little doubt that under the long history of riot as a *common law crime,* the conduct charged would come within a possible permissible constitutional construction of the statute by the state court. We therefore, abstain from any determination as to the constitutionality of this section of the Georgia Criminal Code.

■ We come next to the contention that, regardless of whether the Riot Statute, which was the principal statute under which the plaintiffs are being prosecuted, is constitutional or not, it and the city ordinances are being applied against SNCC and its members and others engaged in similar actions to further the rights of the Negro race, not in a bona fide effort to vindicate the state's criminal laws, but only to discourage the plaintiffs' civil rights activities. Such a contention, if proved, has been held by the Supreme Court to entitle the complaining parties to relief. In *Dombrowski,* the Court said:

"Appellants have attacked the good faith of the appellees [state officials] enforcing the statutes, claiming that they have invoked, and threaten to continue to invoke, criminal process without any hope of ultimate success, but only to discourage appellants' civil rights activities. If these allegations state a claim under the Civil Rights Act, 42 U.S.C. Sec. 1983, as we believe they do, see Beauregard v. Wingard, 230 F.Supp. 167 (D.C.S.D.Calif.1964);

10a. Moreover, this statute has been limited by several holdings of the Georgia courts solely to acts of violence by two or more persons acting in concert. E. g., Taylor v. State, 8 Ga.App. 241, 68 S.E. 945.

Bargainer v. Michal, 233 F.Supp. 270 (D.C.N.D.Ohio, 1964), the interpretation ultimately put on the statutes by the state courts is irrelevant."

Plaintiffs assume an extremely heavy burden if they hope to prevail on this issue. The theory upon which they proceeded was that defendant Carmichael and the SNCC organization were immediately cast in the light of the villains in the violence that erupted on September 6th, and that the defendants, under pressure by both local and national demands, set out to "get" Carmichael and other SNCC leaders without regard to whether a case could properly be made against them or not.

■ We conclude that the plaintiffs have simply failed to carry this burden. Evidence introduced in this record does fully indicate that there was an immediate outcry against SNCC and Carmichael. This may have been largely due to prior publicity affecting both of these plaintiffs. It must be remembered, however, that this publicity, no matter how accurate or inaccurate it may have been, and however misleading or factual it may have been, is also protected by our cherished principle of freedom of expression. It may have been that some of the defendants formed erroneous first impressions as to the role of Carmichael and SNCC and the extent to which they were actually involved. As to this we make no finding, since the record before us is clear that no arrests under the pending indictments were made until after the police officials initially, and the prosecuting officers, in the second instance, had received information which this court finds was adequate to dispel any suspicion that the subsequent prosecutions were had in bad faith or as a result of any improper motive to pillory these particular plaintiffs.

If the defendants, or any of them, had proceeded to prosecute the plaintiffs on any of the insurrection statutes which had actually been outlawed by the United States Supreme Court, there would have been some substance to the plaintiffs' contention that such conduct was for the purpose of harassment and not with the hope of ultimately succeeding. To the contrary, it is evident that the defendants carefully considered the availability of the insurrection statutes, and, upon learning of the prior decisions in the federal courts relating to them, discarded them as being unavailable in the circumstances. The "insurrectionary papers" statute, which we how hold to be invalid, has not, of itself, been heretofore invalidated by any court.

■ The plaintiffs' attempt to show that some of the defendants proceeded against Carmichael after they had said they did not have sufficient evidence to warrant his arrest, avails them nothing, because the evidence disclosed further that the prosecutions against him were not commenced until after further evidence came to light. The sufficiency of such evidence and its application to the riot statute are matters that will have to be disposed of in another forum. This court does not find sufficient evidence to determine that the prosecutions were either commenced, or are being continued, in bad faith for the improper purpose of interfering with the plaintiffs' civil rights.

■ We come finally to the attack made by the plaintiffs on Section 20-7 of the Atlanta City Ordinances. Even the most casual reading of this ordinance demonstrates the genuineness of the attack made upon it. The ordinance provides:

"Disorderly Conduct—It shall be unlawful for any person to act in a violent, turbulent, quarrelsome, boisterous, indecent or disorderly manner, or to use profane, vulgar or obscene language, or to do anything tending to disturb the good order, morals, peace or dignity of the City."

What was said by the United States Supreme Court in Cantwell v. Connecticut, 310 U.S. 296, at page 308, 60 S.Ct. 900, at page 905, 84 L.Ed. 1213, is apposite here:

"Here we have a situation analogous to a conviction under a statute

sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application."

In the *Cantwell* case the Supreme Court vacated a conviction in which there was no evidence of violent or tumultuous conduct by the appellants. However, the Court, in its opinion, made it plain that "a state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions."

The Supreme Court has specifically held that a conviction under a breach of the peace statute in South Carolina, where there was evidence that the conduct of the convicted persons had been "boisterous," must be set aside because the statute under which they were convicted permitted conviction if the accused persons "stirred people to anger, invited public dispute, or brought about a condition of unrest." The Court said:

"A conviction resting on any of those grounds may not stand." Edwards v. South Carolina, 372 U.S. 229, 238, 83 S.Ct. 680, 685, 9 L.Ed.2d 697.

This language was quoted by the Supreme Court from its earlier opinion in Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131.

In the *Terminiello* case there was a conviction under a breach of the peace statute.[11] The trial court, during Terminiello's trial charged that "breach of the peace" consists of any "misbehavior which violates the public peace and decorum"; and that the "misbehavior may constitute a breach of the peace if it stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance, or if it molests the inhabitants in the enjoyment of peace and quiet by arousing alarm." Although

the proof adduced against Terminiello indicated that he had used "fighting words" directed towards the persons who were outraged and thus created the turmoil, which on occasions have been held to be outside the scope of the constitutional guarantees, Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031, the Court held that since Terminiello was convicted under a general verdict and the Court construed the language of the statute broadly enough to include speech which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance * * *" the conviction would have to be overturned.

Viewing this City Ordinance realistically, it can hardly be doubted that the language contained in it is broader than both that which was condemned by the Supreme Court in Edwards v. South Carolina, supra, and that condemned in Terminiello v. City of Chicago, supra. It cannot be doubted that the language of the Atlanta City Ordinance would, on its face, prohibit conduct which would stir the public to anger, would invite dispute, would bring about a condition of unrest, or create a disturbance. Moreover, it is clear that it would be an offense under this statute for a person to act in a "boisterous" manner. The Supreme Court has expressly held that the prohibition of such conduct in a statute which can be construed as restricting speech or the right of peaceable assembly, is unconstitutional as being an unwarranted restriction of First Amendment rights, as made applicable to the States under the Fourteenth Amendment. Moreover, it takes no elaboration to demonstrate that the term "vulgar" in connection with "language", and the use of the term "tending to disturb the good order, morals, * * * or dignity of the City" leaves "to the executive and

11. The statute under which Terminiello was convicted provides as follows:
   "All persons who shall make, aid, countenance, or assist in making any improper noise, riot, disturbance, breach of the peace, or diversion tending to a breach of the peace, within the limits of the city * * * shall be deemed guilty of disorderly conduct, and upon conviction thereof, shall be severally fined not less than one dollar nor more than two hundred dollars for each offense." Municipal Code of Chicago, 1939, § 193-1.

judicial branches too wide a discretion in the application" of the law. It too readily permits them to make a crime out of what is protected activity. The plaintiffs are entitled to have an injunction against enforcement by the City of this ordinance as now worded. However, the court will not make such injunctive order binding until after the expiration of sixty days, during which time the City may, if it is so advised, enact such disorderly conduct ordinance as may meet constitutional requirements.

The motions filed by the several defendants to dismiss the complaint are overruled. The motions by both parties to strike parts of the several pleadings are likewise overruled.

The Court has not considered any affidavits tendered in connection with the hearing of the case. The motions of the defendants to restrict the testimony to that orally presented except for documentary evidence, aside from affidavits, need not, therefore, be passed upon.

The motion of the defendants to rule out of evidence the newspaper clippings introduced for the purpose of showing the state of public interest and knowledge and in an effort to show a state of pressure upon the officials of the city of Atlanta and the State of Georgia, is overruled.

All other motions not expressly dealt with are overruled. The parties may present to the court within ten days proposed forms of a final judgment giving effect to this opinion.

### JUDGMENT

This cause, having come on for hearing, and having been heard by the Court on the pleadings and proofs of the parties, oral arguments of counsel for the parties having been heard by the Court and briefs having been filed by the parties, the Court having given due consideration thereto, and findings of fact and conclusions of law having been made by the Court and entered herein;

IT IS HEREBY ORDERED AND ADJUDGED AND DECREED BY THE COURT AS FOLLOWS:

1. That Title 26, Georgia Code Annotated, Section 901, which defines and proscribes the penal offense of "Insurrection" is hereby declared unconstitutional, null and void.

2. That Title 26, Georgia Code Annotated, Section 902, which defines and proscribes the penal offense of "Attempt to Incite Insurrection" is hereby declared unconstitutional, null and void.

3. That Title 26, Georgia Code Annotated, Section 903, which fixes the "Punishment" upon conviction for the offense of insurrection, or an attempt to incite insurrection is hereby declared unconstitutional, null and void.

4. That Title 26, Georgia Code Annotated, Section 904, which defines and proscribes the penal offense of "Circulating Insurrectionary Papers" is hereby declared unconstitutional, null and void.

5. The State of Georgia, intervenor, its officers, agents, servants, employees, and attorneys and the City of Atlanta and its officers, agents, servants, employees and attorneys as well as individually named defendants, are hereby temporarily and permanently restrained and enjoined from instituting future prosecutions under the sections of the Georgia Code hereby declared invalid, and are prohibited from further acts seeking to enforce the provisions of such sections. Further, any pending charges lodged against the plaintiffs herein under such provisions are dismissed instanter.

6. That Section 20-7 of "The Charter, Related Laws, Code and Ordinances of the City of Atlanta," Volume II, Page 1022, which defines and proscribes the petty offense of "Disorderly Conduct" is hereby declared unconstitutional, null and void.

7. In view of the evidence now before the court that the City of Atlanta has, since the filing of the court's opinion on December 13, 1966, instituted prosecutions under such ordinance, but has voluntarily ceased doing so on or about De-

cember 27, 1966, the invalidity of such ordinance is made effective upon the filing of this judgment rather than upon the expiration of the 60-day period originally alluded to in the opinion.

8. The City of Atlanta, its officers, agents, servants, employees and attorneys as well as individually named defendants, are hereby temporarily and permanently restrained and enjoined from instituting future prosecutions under such ordinance, and are prohibited from further acts seeking to enforce the provisions of such ordinance.

9. The court retains jurisdiction of this action, including the motion for further relief filed by plaintiffs on December 27, 1966. The settlement of costs shall be deferred until further order.

10. Except as provided herein, the prayers for relief by plaintiffs are denied.

### SUPPLEMENTAL ORDER

Upon review by the court of the matters raised by the motion for further relief still pending in the within case, and upon consideration of the record, briefs, and the disavowal of prosecution filed with the court,

It is ordered that the City of Atlanta, its officers, agents, servants, employees and attorneys as well as individually named defendants, be and they are hereby temporarily and permanently re-

strained from prosecuting those plaintiffs arrested on or about December 25, 1966, for any violation of the provisions of Section 20–7 of "The Charter, Related Laws, Code and Ordinances of the City of Atlanta," Volume II, Page 1022, which defines and prescribes the petty offense of "Disorderly Conduct" heretofore declared unconstitutional by the court.

All other relief sought by the motions of plaintiffs and defendants is denied.

The plaintiffs having obtained substantial relief in the main suit and the supplemental motion, costs are assessed in favor of the plaintiffs in the following amounts:[1]

| | | |
|---|---|---|
| 1. | Clerk's fees | $ 15.00 |
| 2. | Marshal's fees | 54.00 |
| 3. | Witness fees | 18.00 |
| 4. | Fees for transcripts | |
| | a. Of original hearing | 129.40 |
| | b. Of pre-trial hearing | 28.20 |
| | c. Of January 3 hearing | 72.80 |
| 5. | Depositions | 289.00 |
| 6. | Map of Atlanta | 1.00 |
| | **TOTAL** | **$607.40** |

The main portion of the trial being consumed with the state prosecutions, the above costs are assessed 75% on the State of Georgia, acting through the Solicitor-General, and 25% on the City of Atlanta.

It is so ordered.

---

1. This assessment assumes that the figures filed with the court are correct. All of the items claimed are normally approved in this district with the exception of item 4, "Fees for transcripts." In this connection, the court ordered the pre-trial transcript furnished to each party. In the two hearings, the original transcript was ordered by the court and extensively used as a necessary part of the case. However, the prevailing rule in this circuit does not allow the costs of copies obtained by counsel, even though ordered in good faith for use in preparing proposed findings of fact. This is partly so because the original is on file and available to the parties for such purpose and copies are for convenience only. See Department of Highways v. McWilliams Dredging Co., D.C., 10 F.R.D. 107(7) aff'd 187 F.2d 61 (5th Cir. 1951); United States v. Lynd, 334 F.2d 13 (5th Cir. 1964).

Accordingly, the costs of copies ordered by plaintiff's counsel in the following amounts have been disallowed:

| | | |
|---|---|---|
| a. Of original hearing | 1st copy | $170.40 |
| | 2nd copy | 85.20 |
| b. Of January 3 hearing | 1st copy | 73.20 |
| TOTAL | | $328.80 |